NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JANE A., | ) | |
| | ) | Supreme Court No. S-16547 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-15-00175/ |
| v. | ) | 00176 CN |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | MEMORANDUM OPINION |
| OF HEALTH & SOCIAL SERVICES, | ) | AND JUDGMENT* |
| OFFICE OF CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | No. 1651 – October 25, 2017 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: Megan R. Webb, Assistant Public Defender, Anchorage, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Ruth Botstein, Senior Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

## I. INTRODUCTION

A mother appeals the termination of her parental rights to her two young children. She argues that the superior court erred in finding that she had failed to remedy her conduct within a reasonable time. After taking custody of her children, the Office

---

\*       Entered under Alaska Appellate Rule 214.

of Children's Services (OCS) was frequently unable to reach the mother while the children were in its custody. She only made progress on her case plan while she was incarcerated, and she never started drug treatment. The day before the termination trial she contacted several service providers in an attempt to set up the necessary programs and services. Her parental rights were terminated at trial, and she appeals only the determination that she failed to remedy her conduct within a reasonable time. We affirm.

## II. FACTS AND PROCEEDINGS

Jane A. has two children, Garret and Declan, born in 2013 and 2014.[1] Before the children were born Jane had a varied criminal history, including a felony drug conviction in 2012. OCS received drug-related reports when both children were born: Garret tested positive for cocaine when he was born, and Jane tested positive for opiates at Declan's birth. Both times Jane substantially complied with an OCS Safety Plan or OCS's requests, including urinalysis (UA) tests, and no further action was taken.

In March 2015 OCS received another report of harm, claiming that Jane might be using drugs and that there was a warrant for her arrest because she had failed to appear at a court hearing in a criminal case. Jane's probation officer reported to OCS that Jane was likely using drugs again because she had absconded from probation supervision and missed appointments for required UAs. The OCS worker located Jane and spoke to her outside a friend's house, but Jane left in the middle of the conversation, leaving the children with friends. OCS was unable to reach Jane again that day and assumed emergency custody of the children. In hair follicle drug tests taken that day, both boys tested positive for methamphetamine, and Garret also tested positive for marijuana and cocaine.

---

[1]     We use pseudonyms to protect the privacy of the parties.

OCS prepared a case plan for Jane that required her to obtain a substance abuse assessment, comply with any recommended treatment, and participate in regular UAs to demonstrate her sobriety. OCS continued to have difficulty contacting Jane. The caseworker eventually made phone contact with Jane through her mother and tried to schedule meetings, but Jane did not show up. The caseworker was finally able to meet with Jane in person at the end of June. After that meeting OCS made referrals for a substance abuse assessment, but the providers were unable to follow up with Jane because her phone number changed or she did not return calls. OCS was also unable to set up UAs because Jane was "always resistant." Jane did consistently attend supervised visitation with the children for a few months, but additional visits in the community arranged by the children's foster family were eventually stopped when Jane showed up intoxicated or "under some influence" several times.

In September Jane stipulated to the boys' adjudication as children in need of aid under AS 47.10.011 (10) (parental substance abuse). In early November OCS updated her case plan. All of Jane's goals remained the same as in the original case plan, but the updated case plan stated that she had made no progress on any goal except for consistent visitation, which was labeled "Minimal Progress."

Jane was arrested on the outstanding warrant in early 2016. While she was in jail she completed a substance abuse assessment but did not participate in any treatment. She also participated in several classes, including parenting and anger management.

OCS filed a petition to terminate Jane's parental rights in June, citing several grounds for the children being in need of aid under AS 47.10.011, including (1) (abandonment) and (10) (parental substance abuse).

Jane was released from jail in July 2016. OCS was unable to obtain the substance abuse assessment from the Department of Corrections, so OCS made new

referrals for Jane. But the providers were again unable to contact Jane to schedule an appointment. The caseworker testified that she tried to encourage Jane to connect with the providers, but although Jane was always cooperative and "appeared motivated," she never followed through. The caseworker also testified that Jane continued to avoid her UA appointments and "would say, 'I'm using right now. I can't UA. Maybe on Monday.'" OCS referred her for UAs anyway; the record contains ten UA appointment records between July and early September 2016, and Jane did not show for any of them. OCS also set up supervised visitation with the children again, but Jane did not participate consistently.

At the November trial the caseworker testified that contact with Jane since her release had been "sporadic." She also testified that Jane had told her she had returned to using drugs after her release but would not tell her which drug or drugs she was using. At one point Jane came to the OCS office and said she was sober, so the caseworker asked her to take a UA that day to document her sobriety. She testified that Jane had "laughed and said, no, she wasn't ready," which the caseworker took to mean that Jane believed she would fail the test if she took it that day. The caseworker also gave Jane a calendar of Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) meeting information and asked her to fill out an attendance log, but Jane never returned it to her.

At the termination trial Jane testified that she had talked to service providers the previous day about getting a mental health assessment and substance abuse assessment. She also testified that she had taken other steps to be ready to care for her children, including applying for a job. Jane said working on her case plan was her "top priority" and asked for more time to work on it and prove she could take care of her children.

The superior court terminated Jane's parental rights. It found that the children had been subject to conduct or conditions making them in need of aid under AS 47.10.011(1) (abandonment) and (10) (parental substance abuse). The court found that OCS had proved by clear and convincing evidence that Jane had not remedied the conduct or conditions that placed her children at substantial risk of harm. It cited her own testimony of past relapses, including one just three weeks earlier, and opined that at best, she had just begun to address her substance abuse issues and "there[] [was] nothing in the record . . . that would indicate that [granting her] more time [would] do the trick." The court also noted that, despite OCS's consistent efforts to contact Jane and make services available to her, Jane would "express desire to engage, but . . . wouldn't follow up," which gave the court no reason to believe that "tomorrow [would] be any different."

## III. STANDARD OF REVIEW

Whether a parent has remedied the conduct or conditions placing a child in need of aid is a factual determination[2] that we review for clear error.[3] A factual finding is "clearly erroneous only if, after a review of the entire record in the light most favorable to the party prevailing below, we are left with a 'definite and firm conviction' that a mistake has been made."[4]

---

[2] *Trevor M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 368 P.3d 607, 609-10 (Alaska 2016) (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 948-49 (Alaska 2013)).

[3] *Id.* at 609 (quoting *Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 343 P.3d 425, 430 (Alaska 2015)).

[4] *Payton S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 349 P.3d 162, 167 (Alaska 2015) (quoting *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 322 P.3d 842, 849 (Alaska 2014)).

## IV. DISCUSSION

To terminate parental rights a court must find by clear and convincing evidence that (1) the child is in need of aid; (2) the parent has not remedied the conduct or conditions that place the child at substantial risk of harm or has failed to remedy them within a reasonable time; and (3) OCS has made reasonable efforts to enable the child's return to the home.[5] It must also find by a preponderance of the evidence that the termination is in the child's best interests.[6]

The superior court found that Jane's children had been subject to conduct or conditions making them in need of aid under AS 47.10.011 (1) (abandonment) and (10) (parental substance abuse).[7] Jane challenges the court's finding that she failed to remedy her conduct within a reasonable time.

The superior court may consider any factors relating to the child's best interests when it evaluates whether a parent has remedied the conduct placing her children at risk of harm.[8] Those factors include "the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs," the parent's efforts to remedy the conduct, the parent's history of such conduct, and "the likelihood

---

[5]     AS 47.10.088(a).

[6]     CINA Rule 18(c)(3); *see also* AS 47.10.088(c).

[7]     Although these findings are not challenged on appeal, we note that the superior court's findings with respect to abandonment were extremely brief and did not refer to the applicable legal framework. *See* AS 47.10.013 (detailing when abandonment may be found); *Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 251 P.3d 330, 335 (Alaska 2011) (quoting *Rick P. v. State, Office of Children's Servs.*, 109 P.3d 950, 957 (Alaska 2005)) (explaining a two-part test for abandonment findings).

[8]     AS 47.10.088(b).

that the harmful conduct will continue."[9]  "The determination 'must be made on a case-by-case basis and the amount of time considered "reasonable" will vary' " and "is likely to be shorter for young children."[10]  And "[t]he superior court is entitled to rely on a parent's documented history of conduct as a predictor of future behavior."[11]

Jane argues that the court was wrong to find she had failed to remedy her conduct within a reasonable time because she had not been given a reasonable time in which to act.  She argues that the court erroneously believed "there was nothing to indicate that more time would be beneficial" to her and failed to give her credit for the things she had done in attempting to remedy her conduct.  She argues that, because she had taken some steps and was trying to do more at the time of trial, she deserved more time in which to succeed.

OCS focused on Jane's history of substance abuse in designing her case plan.  She had been convicted of a cocaine offense before her children were born and used cocaine while pregnant with Garret.  She admitted to using methamphetamine when OCS took custody of the children but failed to disclose on her prison substance abuse assessment that she had used it.  She also consistently used alcohol and marijuana.

---

[9]  *Id.*

[10]  *Trevor M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 368 P.3d 607, 612 (Alaska 2016) (quoting *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1107-08 (Alaska 2011)).

[11]  *Casey K. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 311 P.3d 637, 644 (Alaska 2013) (quoting *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 74 P.3d 896, 903 (Alaska 2003)).

Jane's case plans therefore required a substance abuse assessment and treatment. "A failure to comply with a case plan may constitute a failure to remedy,"[12] and even "completion of a case plan does not guarantee a finding that [a parent] has remedied her conduct."[13] Yet Jane had barely begun to work on hers by the trial date despite months of efforts by OCS to engage her. She was released from jail in July 2016, but she had not yet scheduled a substance abuse assessment by the time of trial in early November. Jane testified that in September she had tried to schedule a free assessment but was told that the provider was booked until October. Rather than waiting the few weeks to receive the free assessment, she said she "just decided to pay for it, to get [her] assessment done," evidently intending to schedule an assessment with a different provider. But she did not call to make another appointment until the day before the termination trial. Jane also failed to attend or reschedule ten UA appointments between July and early September.

We have upheld a superior court's finding that parents have failed to remedy conduct when the parents have done a great deal more than Jane. In *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, the mother had

---

[12] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 310 P.3d 943, 952 (Alaska 2013) (citing *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008)).

[13] *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1260 (Alaska 2010). *See id.* at 1260 n. 40 ("Compliance with treatment plans does not guarantee that parental rights will not be terminated because it cannot guarantee that adequate parenting skills will be acquired from the treatment regimen." (quoting *V.S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 45 P.3d 1198, 1208 (Alaska 2002))).

been sober for a year, regularly attended AA, and submitted to random UAs.[14]  We nevertheless upheld the superior court's finding that she had failed to remedy her conduct, noting that the superior court was "entitled to rely on a parent's documented history of conduct as a predictor of future behavior" and that the judge had "relied upon [the mother's] long history of substance abuse in making his determination."[15]

The superior court found that Jane's long history of substance abuse was "inhibiting" her ability to parent.  It noted that she had admitted to a relapse only three weeks before trial.  The court credited her with speaking "directly and candidly about [her] past usage and troubles."  But it did not believe her claims that she would do whatever it took to remedy her conduct:  "[Y]ou say now you'll do whatever it takes, and, yet, you were released from prison in July. . . . But [you] always [have] a reason to not get engaged."  The court stated that there was nothing it could "rely on there that this time it's different."

The superior court justifiably relied on Jane's history of substance abuse, her failure to act on her case plan, and the lack of credibility in her statement that she was ready to change.[16]  Its findings are not clearly erroneous.

## V.    CONCLUSION

We AFFIRM the judgment of the superior court.

---

[14]     74 P.3d at 902-03.

[15]     *Id.* at 903.

[16]     *See Day v. Williams*, 285 P.3d 256, 260 (Alaska 2012) ("[W]e grant 'particular deference to the trial court's factual findings when they are based primarily on oral testimony, because the trial court, not this court, performs the function of judging the credibility of witnesses and weighing conflicting evidence.' " (quoting *Millette v. Millette*, 177 P.3d 258, 261 (Alaska 2008))).